**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **Kenneth Hillman,** *et al.*, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | **CIVIL ACTION NO. _____** |
| | § | |
| **V.** | § | **Rule 9(h) Admiralty** |
| | § | |
| | § | **JUDGE_____** |
| | § | **MAGISTRATE JUDGE_____** |
| **Intercontinental Terminals Company,** | § | |
| **LLC** | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT FOR DAMAGES**

**NOW COMES PLAINTIFFS,** Kenneth Hillman, *et al.*, including Plaintiffs further

identified in Exhibit A, attached, through undersigned counsel who do allege, aver and represent

as follows:

### I.       SUMMARY OF THE CASE

1.       Intercontinental Terminals Company, LLC, ("Defendant" or "ITC") is a

petrochemical storage and terminal company with a facility located on the Buffalo Bayou at

1943 Independence Parkway, La Porte, Texas. Buffalo Bayou empties into the nearby San

Jacinto River, which flows into Galveston Bay. The Houston Ship Channel is comprised of

Buffalo Bayou, a portion of the San Jacinto River, and a portion of Galveston Bay. The Houston

Ship Channel and Galveston Bay are connected to Trinity Bay, which lays to the East of the

Houston Ship Channel and the ITC facility.

2.       The Galveston and Trinity Bay complex ("Bay Complex") is a diverse ecosystem

composed of freshwater rivers, fresh and brackish marsh, and large bays which are influenced by

1

the San Jacinto River, Trinity River, Old River, Lost River, and saltwater exchange with the Gulf

of Mexico. The Bay Complex supports a substantial seafood and fishing industry. The brackish

mixture of salt and fresh water provides nursery and spawning grounds for many types of marine

life including crabs, shrimp, oysters, and many varieties of fish.

3.      The present action focuses on a catastrophic pollution event perpetrated by ITC.

At around 10:30 a.m. on March 17, 2019, a fire ignited in the tank yard of the ITC facility at 1943

Independence Parkway, La Porte, Texas. The fire first spread to a storage tank of Naphtha, and

soon spread to engulf many other tank units. The fire emitted a dark plume of toxic chemical

smoke which was visible for miles throughout surrounding communities.

4.      The fire burned for several days, spreading to several other storage tanks, until the

fire was eventually subdued on March 20, 2019. A multitude of toxic chemicals have been

detected as a result of the fire, including but not limited to Toluene, Xylene, Naphtha, and

Benzene. Local communities were forced to shelter-in-place, and local school districts suspended

classes to mitigate exposure to the chemicals -- short-term exposure to which can cause fatigue,

dizziness, and headaches. Dangerous conditions prompted the closure of the San Jacinto

Monument, Battleship Texas State Historic Site, and the Lynchburg Ferry crossing. Although the

fire was eventually extinguished, the environmental effects of the disaster are far from over.

5.      The effects of the disaster are not limited to the land and atmosphere. Dangerous

petrochemical runoff resulting from the fire quickly entered the surrounding waterways.

Desperate attempts by local authorities to contain the chemicals, including the placement of

booms across adjacent waterways, have failed to prevent the spread of the petrochemicals.

Authorities have issued advisories against the consumption of any fish species for the surrounding

areas, including the Houston Ship Channel and all contiguous waters north of the Fred Hartman

Bridge, part of State Highway 146. Consumption advisories for speckled trout and blue crab were subsequently issued for waters extending as far south as Red Bluff Point and Houston Point.

6.     As the effects of the fire directly impacted local communities, coverage of the disaster soon spread to local, national, and international media outlets. As a result of this coverage, Buffalo Bayou, the Houston Ship Channel, the San Jacinto River, and Galveston and Trinity Bays have become synonymous across the country and across the globe as dangerous and toxic waterways.

7.     Plaintiffs herein seek remedy under general maritime law for ITC's conduct which caused the chemical fire and subsequent runoff of toxic petrochemicals into surrounding waters. As a result of ITC's actions, Plaintiffs' home waters are significantly, and perhaps irreparably, impaired. Plaintiffs have experienced lost wages and earnings. Even in areas where seafood consumption has not yet been banned outright, public confidence in consuming Bay Complex seafood has been lost. Public confidence in the overall safety of the Bay Complex is severely diminished. ITC's actions imposed significant economic and emotional harms on Plaintiffs.

## II.  DISCOVERY

8.     Plaintiffs will conduct discovery under a Level 2 Discovery Control Plan pursuant to Texas Rule of Civil Procedure 190.3.

9.     This case is not subject to the restrictions of expedited proceedings under Texas Rule of Civil Procedure 169, because Plaintiffs seek relief that exceeds $100,000.00.

## III.  PARTIES

10.     Plaintiffs herein are composed of commercial fishermen, commercial seafood businesses, commercial dock owners, and professional finfish fishermen who depend on the Bay

Complex and surrounding waterways' natural resources for their welfare and livelihood. Plaintiffs, individuals and/or entities, have suffered losses under admiralty or maritime law. As a result of ITC's actions and resulting spread of toxic petrochemicals, Plaintiffs have experienced significant injuries including but not limited to, lost wages, lost sales, lost profits, and a loss of public confidence in safety and seafood in the Bay Complex area. Each Plaintiff in this case has been harmed by the Defendant's conduct.

11.     Defendant is a foreign limited liability company organized under the laws of Delaware and doing business in Texas at all times material herein. The defendant maintains a registered agent for service of process in the State of Texas and may be served with process by serving its statutory agent for service of process, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136, or wherever it may be found.

## IV.   REQUEST PURSUANT TO RULE 28

12.     To the extent that Defendant ITC is conducting business pursuant to a trade name or assumed name, then suit is brought against Defendant ITC pursuant to the terms of Rule 28 of the Texas Rules of Civil Procedure, and Plaintiffs demand that, upon answer to this Petition, that Defendant ITC answer in its correct and legal assumed name.

## V.   JURISDICTION AND VENUE

13.     The Court has original jurisdiction over this action based on a federal question pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution, laws, or treaties of the United States.

14.     The Court has original jurisdiction over this action based on diversity pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, and complete diversity is present, as the parties to this action are citizens of different states.

15.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1333 because this action is a civil admiralty or maritime case.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in Harris, Chambers, and Galveston counties, Texas.

17.     Plaintiffs designate the claims herein, where applicable, as admiralty or maritime claims pursuant to Federal Rule of Civil Procedure 9(h).

## VI.     FACTUAL ALLEGATIONS

18.     On the morning of March 17, 2019 at approximately 10:33 am, a fire and subsequent explosions occurred at a petrochemical facility located on the shores of the upper Galveston Bay Complex. The facility, commonly known as Intercontinental Terminals Company ("ITC"), is located at 1943 Independence Parkway, which is in La Porte, (unincorporated) Harris County, Texas. A secondary address for the facility is 2621 Tidal Road, which is in Deer Park, (unincorporated) Harris County, Texas. The complex is located within the Houston Ship Channel Industrial Complex. On Wednesday, March 20, 2019 at approximately 3:03 am, the fire was extinguished. During the days of the fire from March 17, 2019 through March 20, 2019, and for several days thereafter, the ITC facility spilled large quantities of highly toxic chemicals in the Houston Ship Channel and Galveston Bay Complex.

19.     The specific area of ITC facility where the fire occurred is known throughout the company as the "Second 80`s." This is because the tanks located within this section of the tank farm are 80,000 barrel tanks. They are approximately 120` tall and 40` in diameter. The tanks are of welded construction and have a wall thickness of approximately 1-1/2". The tank farm itself is

approximately 328,000 square feet with piping and equipment throughout. The Second 80`s contained 15 tanks in a 3 x 5 construction.

20.     The levels for the tanks are monitored in a control room and recorded using Supervisory Control and Data Acquisition ("SCADA") data. Harris County Fire Marshal's Office ("HCFMO") data gathered by a subpoena served to ITC in connection with HCFMO's investigation into the incident shows that petrochemical product was being released from Tank number 80-8 for approximately 30 minutes. Approximately 9,000 gallons or 220 Barrels of Butane-enriched Naphtha would have been released during this time period. For reference, according to the American Petroleum Institute, a barrel is approximately 42 U.S. gallons. Due to the facilities' close proximity to the Houston Ship Channel, the majority of these petrochemicals, combined with run off from the continuous firefighting efforts, entered the Galveston Bay Complex.

21.     The HCFMO determined that the fire that occurred at the ITC facility on March 17, 2019 was the result of a failure within the manifold power frame of Tank 80-8. The failure within the power frame resulted in an uncontained release of Naphtha enriched with Butane.

### Bay Complex and Houston Ship Channel

22.     The Bay Complex is a well-known fishing ground for many species, including spotted seatrout or "speckled trout" (*Cynoscion nebulosus*), red drum or "redfish" (*Sciaenops ocellatus*), and the southern flounder (*Paralichthys lethostigma*). The Bay Complex is also home to the Eastern Oyster (*Crassostrea virginica*), which grows in large beds or reefs across the bay, and brown and white shrimp (*Farfantepenaeus aztecus* and *Litopenaeus setiferus*, respectively).

23.     The Bay Complex contains excellent fish habitat including natural and manmade shell reefs, and manmade structures in the form of pipe stands, production wells, separators and wrecks.

24.     Galveston Bay is the top producers of oysters and shrimp in Texas. Many oyster beds are open to harvest by the public during specific seasons, while others are privately leased and open for harvest year round. Oysters spawn in warm weather, usually in late spring to early fall. Oyster larva, called "veligers," are highly vulnerable to pollution. Veligers ride the tides and currents until they reach a suitable spot to settle and grow. After veligers settle and mature into sedentary adult oysters, they cannot move if the area in which they live undergoes a change in water quality. As a result, the filter-feeding oysters accumulate contaminants and pollutants from the bay waters in which they live. Being estuarine in nature, oysters can tolerate fairly broad changes in siltation, temperature, salinity, tidal fluctuations, etc., and they can weather extreme changes in their environment for short periods of time by tightly closing their shells. However, they must eventually open their shells or risk drowning in their own waste, and if conditions have not improved, the oysters will die.

25.     Plaintiffs are expected to provide a safe catch for public consumption. The closure of portions of the Houston Ship Channel and Bay Complex to Plaintiffs, as well as the contamination of the highly sensitive marine ecosystem, which was a direct result of Defendant's actions, has foreclosed Plaintiffs from utilizing an enormous area of what was once productive fishing grounds.

26.     Plaintiff oystermen rely on public and private oyster leases for their livelihood. In addition to impacts on the Bay Complex oysters, the spill is likely to have significant effects on the vitality of the Bay Complex's shrimp, crab, and finfish populations.  The spill coincides with

oyster and shrimp spawning seasons, when hundreds of millions of vulnerable veligers, eggs, sperm, and larva are distributed across the bay. In addition to the immediate impacts, the toxic petrochemicals released into the bay as a result of Defendant's actions has the potential to significantly and detrimentally impact the Bay Complex seafood population for years to come.

27.     Commercial entities such as Plaintiff Baytown Seafood, LLC ("Baytown Seafood") also heavily rely on the health of the Bay Complex and its commercial fisheries for their livelihood. For non-limiting example, approximately fifteen (15) commercial fishing vessels exclusively sold their catch to Baytown Seafood. Baytown Seafood had verbal, exclusive contracts with these commercial shrimp vessel owners whereby the shrimp vessel owners would dock and sell seafood at Baytown Seafood, and Baytown Seafood provided shrimp boxes and the free use of its tools and equipment to the shrimp vessels. The commercial shrimp vessels were only required to pay for gas and ice. The spill's impacts on the Bay Complex commercial fisheries thus extend to related businesses which depend on a supply of healthy seafood from the commercial fishermen.

28.     As a result of Defendant's actions, much of the Houston Ship Channel and Galveston and Trinity Bays have been contaminated by toxic chemicals, seafood consumption bans and advisories have been issued, and public confidence in the area as a producer of safe seafood has been severely damaged. These losses and resulting injuries have had profound impacts on Plaintiffs.

29.     Public opinion of the safety and desirability of seafood from the Bay Complex area has been negatively and substantially impacted as a result of the disaster, and has resulted in actual economic losses to Plaintiffs. The diminished public opinion of Bay Complex waters has resulted in the catastrophic economic losses to Plaintiffs.

30.     As a result of Defendant's actions, consumption bans and advisories have been imposed on the consumption of seafood from the Galveston Bay Complex. Bans and advisories have been widely publicized. Simply put, as a result of Defendant's actions, a public stigma hovers over the Houston Ship Channel and the Bay Complex—all of which form the basis of Plaintiffs' livelihoods.

31.     Plaintiffs seek to recover economic damages to compensate for reduction in harvest, decline in demand for Galveston Bay seafood, and the stigma and the loss of business it has caused and will cause for the next five (5) years.

## VII.   CLAIMS FOR RELIEF UNDER GENERAL MARITIME LAW

### NEGLIGENCE

32.     Plaintiffs re-allege each and every allegation set forth above.

33.     At all times material hereto, Defendant owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the operation of the ITC facility and tank farm, including its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against/or present the risk of chemical petrochemical spill into the Bay Complex.

34.     The existence and breach of these legal duties are established under general maritime law.

35.     The fire and explosions at the ITC facility and tank farm and the resulting spill of toxic and hazardous materials was caused by the negligence of the Defendant and renders Defendant liable to Plaintiffs.

36.     Defendant knew of the dangers associated with operating and maintaining the ITC facility and tank farm and failed to take appropriate measures to prevent damage to Plaintiffs and the Bay Complex's marine and coastal environments and estuarine areas.

37.     Defendant was under a duty to exercise reasonable care in the operation and maintenance of the ITC facility and tank farm to ensure a fire and explosion and subsequent discharge and spill of petrochemicals did not occur as a result of such operation and maintenance.

38.     Defendant was under a duty to exercise reasonable care to ensure that if petrochemicals were discharged in the event of fire and explosion, or similar event, that the petrochemicals would be contained and/or stopped within the immediate vicinity of the ITC facility and tank farm in in expeditious manner and not permitted to enter into the Bay Complex's marine and coastal environments and estuarine areas.

39.     Defendant failed to exercise reasonable care while operating and maintaining the ITC facility and tank farm to ensure that a fire and explosion, and subsequent spill of petrochemicals did not occur, and thereby breached duties owed to Plaintiffs.

40.     Defendant failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled fire and subsequent spill of oil and chemicals into the Galveston Bay Complex's marine and coastal environments and estuarine areas, and thereby breached duties owed to Plaintiffs.

41.     Plaintiffs' damages were actually and proximately caused by Defendant's breaches.

## NEGLIGENCE *PER SE*

42.     Plaintiffs re-allege each and every allegation set forth above.

43.     The conduct of the Defendant with regard to the operation and/or maintenance of the ITC facility and tank farm, its appurtenances and equipment is governed by the numerous state and federal laws and permits issued under the authority of these laws. These law and permits create statutory standards that are intended to protect and benefit Plaintiffs. Defendants violated these statutory standards.

44.     As a result of these acts and omissions by Defendant, such violations of state and federal law are a *per se* breach of Defendant's duty to Plaintiffs. The aforementioned violations by the Defendant of state and federal laws and regulations are the actual and proximate cause of Plaintiffs' damages.

45.     The violations of these statutory standards constitute negligence per se under general maritime law.

## GROSS NEGLIGENCE and WILLFUL MISCONDUCT

46.     Plaintiffs re-allege each and every allegation set forth above.

47.     Defendant owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with operation and maintenance of the ITC facility and tank farm, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of spill or discharge of petrochemicals into the Bay Complex. The existence and breach of these legal duties are established under general maritime law and the state law as deemed applicable herein.

48.     Defendant's acts and omissions, when viewed from the standpoint of the actors at the time of the incident, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendant's conduct illustrates not only an attitude of

11

conscious indifference to the rights, safety and welfare of Plaintiffs and others, but also shows Defendant's actual and subjective awareness of the dangers of such conduct.

49.     Due to Defendant's conscious indifference and/or subjective and actual awareness of the dangers its actions posed to others, Defendant proceeded with disregard to the rights, safety or welfare of others, including Plaintiffs. Thus, Defendants were grossly negligent and acted with malice. As a result of Defendant's grossly negligent and malicious actions, Plaintiffs have suffered damages. Defendant's grossly negligent and malicious actions were the actual and proximate cause of Plaintiffs' damages.

50.     Defendant knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the fire and subsequent spill.

51.     Defendant acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs, by, *inter alia*, failing to properly inspect, test, and maintain critical equipment intended to prevent fire and the subsequent discharge of hazardous chemicals as well as failing to keep, test, inspect, maintain, implement, and deploy firefighting and spill containment equipment, tools, and devices to prevent the discharge of oil and chemicals into the Bay Complex.

## VIII.   DAMAGES

52.     Plaintiffs re-allege each and every allegation set forth above.

53.     As a direct and proximate result of Defendant's acts and omissions as set forth above, Plaintiffs have incurred one or more of the following categories of damages:

   a. Compensatory, incidental, and consequential damages in amounts to be determined at trial;
   b. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

      c.    Attorneys' fees and costs of litigations;

      d.    Loss of wages/earnings, past and future; and

      e.    Such other damages as will be shown at trial.

## IX.  PUNITIVE DAMAGES

54.     Plaintiffs re-allege each and every allegation set forth above.

55.     The injuries sustained by Plaintiffs resulted directly from Defendant's gross negligence and malice.

56.     Furthermore, Defendant is liable for the damages attributed to its vice principals because they have authority over the nondelegable responsibility of Defendant.

57.     Any caps on punitive damages, under state or federal law, should not be applied because Defendant's conduct disqualifies it from any caps on exemplary damages

## X.  PRAYER

58.     WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for compensatory, incidental, consequential, and special damages as set forth above; punitive damages; pre-judgment and post-judgment interest; costs of litigation; and for such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Respectfully submitted,

/s/ *Terry Joseph*
Terry Joseph
Texas Bar No. 11029500
tjoseph@matthewsfirm.com
William "Billy" Dills
Wdills@matthewsfirm.com
Texas Bar No. 24067421
David M. Lodholz
Texas Bar No. 24070158
dlodholz@matthewsfirm.com
D. Ryan Cordell, Jr.
Texas Bar No. 24109754
dcordell@matthewsfirm.com
**MATTHEWS, LAWSON,
MCCUTCHEON & JOSEPH PLLC**
5444 Westheimer Road, Suite 1950
Houston, Texas 77056
Telephone: (713) 355-4200
Facsimile: (713) 355-9689
**ATTORNEYS FOR
PLAINTIFFS**